1  Rosemary M. Rivas (SBN 209147)
   rrivas@finkelsteinthompson.com
2  Mark Punzalan (SBN: 247599)
   mpunzalan@finkelsteinthompson.com
3  **FINKELSTEIN THOMPSON LLP**
4  100 Bush Street, Suite 1450
   San Francisco, California 94104
5  Telephone: (415) 398-8700
   Facsimile: (415) 398-8704
6
7  Robert J. Dyer III (*pro hac vice* application forthcoming)
   bob@dyerberens.com
8  Jeffrey A. Berens (*pro hac vice* application forthcoming)
   jeff@dyerberens.com
9  **DYER & BERENS LLP**
   303 East 17th Avenue, Suite 300
10 Denver, CO 80203
   Telephone: (303) 861-1764
11 Facsimile: (303) 395-0393
12
   *Counsel for Plaintiff and the Proposed Class*
13

FILED 2010 NOV 19 P 2:55
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

14              UNITED STATES DISTRICT COURT

15              NORTHERN DISTRICT OF CALIFORNIA

16
   GARFIELD PEATE, on behalf of himself      Case No. CV10 5267 SBA
17 and a class of similarly situated investors,
                                              **CLASS ACTION COMPLAINT FOR
18       Plaintiff,                           VIOLATION OF BUSINESS AND
                                              PROFESSIONS CODE §17200**
19       v.

20 CHARLES SCHWAB INVESTMENT
   MANAGEMENT, INC.; SCHWAB
21 INVESTMENTS; and CHARLES
   SCHWAB & CO., INC.,
22
         Defendants.
23

24

25     Plaintiff, for his complaint, alleges the following upon personal knowledge as to himself

26 and his own acts and as to other matters, upon information and belief, based upon the

27 investigation made by his attorneys, which included, *e.g.*, a review of Securities and Exchange

28 Commission ("SEC") filings, news reports, court filings and other publicly-available materials.

1
CLASS ACTION COMPLAINT

## NATURE OF ACTION

1. This is a class action on behalf of all Colorado residents who held shares of the Schwab YieldPlus Fund (the "Fund") as of September 1, 2006 (the "Class").

2. In registration statements and prospectuses, defendants agreed that the Fund's investment policy may be changed "only by vote of a majority of a fund's outstanding shares."

3. As part of that policy, defendants indicated that the Fund may not "concentrate" in a particular industry and adopted the SEC's definition of "concentration" as investing 25% or more of Fund assets in an industry or group of industries. The Fund also annually declared that it would remain fully diversified and would not concentrate holdings in any particular industry unless a majority of the Fund's shareholders first voted to allow such concentration.

4. The Fund adhered to this provision for many years. But beginning in 2006, in an attempt to boost the Fund's competitive rate of return and to attract more shareholders, the Fund made a deliberate decision to modify and exceed the fundamental policy's 25% limitation on investing in a single industry or group of industries: the Fund invested 28.9% of holdings in mortgage-backed securities. Although required to do so, at no time did the Fund solicit or receive shareholder approval to exceed the 25% ceiling.

5. Moreover, in subsequent filings, defendants sought to hide the change. Buried deep in the September 1, 2006, statement of additional information, defendant Schwab Investments amended the November 15, 2005, prospectus to redefine "single industry" so that there was no limit on the amount of mortgage-backed securities the Fund could hold. In violation of the Investment Company Act ("ICA"), this amendment, which was made retroactive, was done without a shareholder vote. Further, this fundamental change was not noted by any highlight, reference or separate filing, such as a customary and short "supplement" to the prospectus. Defendants undertook the challenged amendment to the Fund's investment policies at Schwab's

California headquarters.

6. In 2007 and 2008, again without shareholder approval, defendants invested over 45% of Fund assets in mortgage-backed securities, with the effect of transforming the Fund into a dramatically higher risk investment. Beginning in late 2007, the higher risk caused by this concentration resulted in the loss of millions of dollars to the Class of Colorado residents.

7. On March 30, 2010, U.S. District Court Judge William Alsup granted partial summary judgment in favor of a class of California Fund investors asserting identical §17200 claims, finding that the defendants violated Section 13(a) of the ICA. *In Re Charles Schwab Corp. Sec. Litig.*, No. C 08-01510, 2010 WL 1261705, at *7 (N.D. Cal. Mar. 30, 2010). Thereafter, the outstanding issues remaining for the trial in that case were limited to the measure and extent of relief to the California class and which of the various defendants took money from the class and thus could be liable for restitution. After the parties to the action reached a preliminary $35 million settlement of the California class's claims, on October 14, 2010, Judge Alsup further ruled that under the limited settlement agreement investors "who are not California residents are free to bring another fresh case under Section 17200." *In Re Charles Schwab Corp. Sec. Litig.*, No. C 08-01510, 2010 WL 4055594, at *4 (N.D. Cal. Oct. 14, 2010). Accordingly, plaintiff hereby brings this §17200 action for restitution on behalf of a Class of similarly situated Colorado investors.

## JURISDICTION AND VENUE

8. This Court has personal jurisdiction over the parties in this case. Defendants are headquartered in this District, conduct substantial business in this State and have systematic and continuous contacts with this State. This Court has jurisdiction over the subject matter of this action pursuant to, *inter alia*: (i) 28 U.S.C. §1332(a)(2) in that plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest

and costs, and (ii) 28 U.S.C. §1322(d)(2).

9. Venue is proper in this District under 28 U.S.C. § 1391(a) because defendants maintain their headquarters within this District. A substantial part of the events or omissions giving rise to the claims alleged occurred within this District. Further, the wrongful conduct at issue in this complaint emanates from California. Indeed, in certifying a similar class of California residents, Judge Alsup found that "defendants undertook the challenged amendment to the fund's investment policies at Schwab's California headquarters." *In re Charles Schwab Corporation Sec. Litig.*, 264 F.R.D. 531, 538 (N.D. Cal. 2009).

## PARTIES

10. Plaintiff Garfield Peate resides in, and is a citizen of, Colorado and began purchasing Fund shares in mid-2005. Plaintiff owned these Fund shares as of September 1, 2006, and suffered significant damages as a result of defendants' unlawful conduct described herein when the Fund's NAV later declined beginning in late 2007.

11. Defendant Charles Schwab Investment Management, Inc., also known as Charles Schwab Investment Management Services ("Schwab Management"), is headquartered at 101 Montgomery Street, San Francisco, CA 94104. Schwab Management is the asset management arm of The Charles Schwab Corporation, with over $200 billion in assets under management. During the relevant time period, Schwab Management oversaw the asset management and administration of the YieldPlus Fund. As compensation for these services, Schwab Management received a management fee from the Fund. The registration statements disclosed that defendant Schwab Management would receive an annual fee of 0.64% of the YieldPlus Investor Share's average net assets, and 0.49% of the YieldPlus Select Share's average net assets.

12. Defendant Schwab Investments also has its headquarters at 101 Montgomery Street, San Francisco, CA 94104. Schwab Investments was organized under Massachusetts law

on October 26, 1990, and is a Massachusetts Business Trust. It is the Registrant for the YieldPlus Fund, the issuer of Fund shares, and performed trust services for the Fund. The YieldPlus Fund is a series of the Trust.

13. Defendant Charles Schwab & Co. ("CSC"), Inc. is also headquartered at 101 Montgomery Street, San Francisco, CA 94104. CSC is the parent company of Schwab Investments. Pursuant to a Distribution Agreement, CSC was, during the relevant time period, the principal underwriter and distributor for shares of the Fund and was Schwab Investment's agent for the purpose of the continuous offering of the Fund's shares.

14. Defendants directly and indirectly controlled the Fund and received money from investors, including members of the Class. Defendants also are under the common control of The Charles Schwab Corporation, a publicly-traded company. The misconduct alleged herein occurred in and/or emanated from California.

## GENERAL ALLEGATIONS

15. The Fund is an open-ended mutual fund organized as a Massachusetts business trust registered under the ICA. It issued two series of securities: Investor Shares (ticker: SWYPX) and Select Shares (ticker: SWYSX). Select Shares have a much higher minimum purchase requirement – $50,000 as compared to $2,500 for Investor Shares. Select Shares have lower expenses than the Investor Shares.

16. Defendants positioned the Fund as a purportedly safe alternative to money market funds but with a higher yield. Throughout the relevant time period, defendants marketed the Fund as an "ultrashort bond fund" designed to invest primarily in investment grade bonds with a duration of one year or less. As described by the various prospectuses, the Fund's basic strategy was to achieve high income returns while avoiding the risks of interest rate fluctuations, illiquidity or share price fluctuations by focusing the Fund's portfolio in very short-term, highly

rated, fixed income securities. The prospectuses touted the Fund's short duration strategy as "maintain[ing] an average portfolio duration of one year or less" in order to "maintain price share stability and preserve investor capital."

17. In registration statements, defendants agreed that the Fund's investment policy may be changed "only by vote of a majority of a fund's outstanding shares." As part of that policy, defendants indicated that the Fund may not "concentrate" in a particular industry and adopted the SEC's definition of "concentration" as investing 25% or more of Fund assets "in an industry or group of industries." The Fund also annually declared that it would remain fully diversified and would not concentrate holdings in any particular industry unless a majority of the Fund's shareholders first voted to allow such concentration.

18. In 2001, the Fund amended its registration statement to state that it would treat mortgage-backed securities issued by private lenders and not federally guaranteed as a stand-alone industry. By defining uninsured mortgage-backed securities to be a stand-alone industry, the Fund was enabled to invest a full quarter of the Fund in such securities in addition to investments in whatever other industries might have comprehended such securities before the change. While this may have enlarged the manager's freedom of movement at the time, it also introduced a limitation if and when the 25% mark was ever reached for uninsured mortgage-backed securities. This limitation remained in place for five years.

19. For example, the Fund's statement of additional information, set forth the limitation as follows:

> The following descriptions of investment securities, risks and limitations supplement those set forth in the prospectus and may be changed with-out shareholder approval unless otherwise noted.
>
> * * *
>
> Concentration means that substantial amounts of assets are invested in a particular industry or group of industries. Concentration increases investment

exposure. Based on the characteristics of mortgage-backed securities, each fund has identified mortgage-backed securities issued by private lenders and not guaranteed by U.S. government agencies or instrumentalities as a separate industry for purposes of a fund's concentration policy. For purposes of a fund's concentration policy, the fund will determine the industry classification of asset-backed securities based upon the investment adviser's evaluation of the risks associated with an investment in the underlying assets. For example, asset-backed securities whose underlying assets share similar economic characteristics because, of example, they are funded (or supported) primarily from a single or similar source or revenue stream will be classified in the same industry sector. In contrast, asset-backed securities whose underlying assets represent a diverse mix of industries, business sectors and/or revenue streams will be classified into distinct industries based on their underlying credit and liquidity structures. A fund will limit its investments in each identified industry to less than 25% of its total assets.

20. Pages later, the statement of additional information set forth another list of "investment limitations" that were changeable "only by a vote of a majority of a fund's outstanding voting shares." Without a shareholder vote, the Fund would not:

> 2) Concentrate investments in a particular industry or group of industries, as concentration is defined under the 1940 Act, or the rules or regulations thereunder, as such statute, rules and regulations may be amended from time to time; and
>
> * * *
>
> Concentration. The SEC has presently defined concentration as investing 25% or more of an investment company's net assets in an industry or group of industries, with certain exceptions.
>
> * * *
>
> 6) Purchase securities (other than securities issued or guaranteed by the U.S. government, its agencies or instrumentalities) if, as a result of such purchase, 25% or more of the value of its total assets would be invested in any industry or group of industries.

In other words, the Fund's stated concentration policy was to diversify, *i.e.*, not to concentrate more than 25% of the Fund in uninsured mortgage-backed securities or in any other industry. Such mortgage-backed securities were specifically called out as an industry subject to the 25% limit.

21. After five years, however, and after having attracted large sums, the Fund managers reversed field and repudiated the 25% limitation. This was stated in the statement of

additional information as of September 1, 2006, as follows:

> Concentration means that substantial amounts of assets are invested in a particular industry or group of industries. Concentration increases investment exposure. For purposes of a fund's concentration policy, the fund will determine the industry classification of asset-backed securities based upon the investment adviser's evaluation of the risks associated with an investment in the underlying assets. For example, asset-backed securities whose underlying assets share similar economic characteristics because, for example, they are funded (or supported) primarily from a single or similar source or revenue stream will be classified in the same industry sector. In contrast, asset-backed securities whose underlying assets represent a diverse mix of industries, business sectors and/or revenue streams will be classified into distinct industries based on their underlying credit and liquidity structures. A fund will limit its investments in each identified industry to less than 25% of its total assets.

\* \* \*

> The funds have determined that mortgage-backed securities issued by private lenders do not have risk characteristics that are correlated to any industry and, therefore, the funds have determined that mortgage-backed securities issued by private lenders are not part of any industry for purposes of the funds' concentration policies. This means that a fund may invest more than 25% of its total assets in privately-issued mortgage-backed securities, which may cause the fund to be more sensitive to adverse economic, business or political developments that affect privately-issued mortgage-backed securities. Such developments may include changes in interest rates, state or federal legislation affecting residential mortgages and their issuers, and changes in the overall economy.

22. This action not only abrogated the 25% limitation on uninsured mortgage-backed securities but even went so far as to say that such securities were not part of "any industry," *thereby raising the 25% concentration limit to 100%*. Put differently, since such securities were not part of "any industry," defendants were now claiming the authority to invest everything in such securities, since to do so would not concentrate in "any industry."

23. This was done unilaterally by the Fund managers and without any shareholder vote. No notice was sent to investors of the reversal in policy. They had no occasion to consult the registration statements, as amended, having already made their investment.

24. For five years the registered policy with respect of concentration committed to invest no more than one fourth of the Fund in uninsured mortgage-backed securities or in any other industry. The strategy was to employ diversification to guard against a precipitous decline

in a single industry. Under the ICA, this registered concentration policy could be reversed only by a majority vote of the shareholders. Section 13 was violated by the unilateral repudiation of the concentration limitation.

25. This is not a disclosure question; it is a governance question. As a matter of governance, the ICA insisted that reversals in concentration policy be approved by those that actually own the Fund, not merely by the managers.

26. By May 31, 2007, the concentration in mortgage-backed securities in the Fund had grown to approximately 46%; by February 29, 2008 it was 50%. These investments ultimately triggered the Class's enormous losses.

27. Plaintiff and the Class were damaged, and their §17200 claims accrued, beginning in late 2007, when the Fund's NAV precipitously dropped as a result of defendants' wrongful conduct. While the Fund's NAV hovered around $9.70 for much of the Fund's history, beginning in late 2007 and accelerating through the first quarter of 2008, the Fund took massive write-downs as it marked the value of mortgage-backed investments down to their reduced market values. These write-downs caused a commensurate decline in the Fund's NAV, which in turn caused investors to abandon the Fund. The NAV plummeted $3.47 to as low as $6.18 per share on August 1, 2008, or a loss of over 35% since late July.

28. Defendants' conduct directly caused enormous investor losses and led to a flurry of governmental investigations, class action securities lawsuits and securities arbitration actions.

29. On March 30, 2010, U.S. District Court Judge William Alsup granted partial summary judgment in favor of a class of California Fund investors asserting identical §17200 claims, finding that certain defendants had—as a matter of law—violated Section 13(a) of the ICA. *In Re Charles Schwab Corp. Securities Litigation*, 2010 WL 1261705, at *7.

//

## CLASS ALLEGATIONS

30. Plaintiff brings this action on his own behalf and on behalf of all others similarly situated. The Class is defined as: all Colorado residents who held shares of the Fund on September 1, 2006. Excluded from the Class are defendants, any subsidiaries or affiliates of the defendants in which defendants or its affiliates have a controlling ownership interest, officers and directors of any of the defendants, heirs, successors and assigns of any of the defendants or their officers and directors, and any entity in which any defendant has a controlling ownership interest.

31. This action is brought and may properly be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3).

32. <u>Numerosity.</u> The members of the Class are so numerous that joinder of all members is impractical. While the exact size of the Class is unknown to plaintiff at this time, it may be ascertained through appropriate discovery. Defendants themselves have estimated that there are approximately 98,000 non-California resident §17200 claims under this theory of recovery. The number of these claims that belong to Colorado residents is unknown at this time.

33. <u>Existence and Predominance of Common Questions.</u> Common questions of law and fact exist as to all members of the Class. These questions predominate over questions affecting only individual Class members. These common legal and factual questions include, for example, the following:

- Whether §17200 applies to Colorado residents when the unlawful conduct at issue occurred in or emanated from California;
- Whether defendants' conduct violated the ICA;
- Whether defendants' conduct violated §17200;
- When Class members' claims accrued;
- Whether Class members are entitled to restitution.

34. <u>Typicality.</u> Plaintiff's claims are typical of the claims of the Class members

because, among other things, plaintiff and Class members were similarly affected by defendants' wrongful conduct.

35. <u>Adequacy.</u> Plaintiff is an adequate representative of the Class because his interests do not conflict the interests of the members of the Class he seeks to represent. Plaintiff has retained counsel competent and experienced in class action litigation and plaintiff intends to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by plaintiff and his counsel.

36. <u>Superiority.</u> A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The expense and burden of individual litigation effectively makes it impossible for most individual Class members to seek redress for the wrongs complained of herein. There are no unusual difficulties likely to be encountered in the management of this action as a class suit that could not be managed by this Court. The advantages of maintaining the action as a class suit far outweigh the expense and waste of judicial effort that would result in hundreds of separate adjudications of these issues for each Class member. Class treatment further ensures uniformity and consistency in results and will provide optimum compensation of Class members for their injuries and deterrence of defendants and other similar businesses from engaging in such wrongful acts in the future.

## CAUSES OF ACTION

## COUNT I

**(Violation of California Business and Professions Code §17200)**

37. Plaintiff incorporates by reference and realleges all paragraphs herein.

38. The acts and practices engaged in by defendants, and described herein, constitute unlawful, unfair, and/or fraudulent business practices. Specifically, defendants have engaged in "unlawful" business acts and practices in violation of §17200 by violating federal law as described above, including but not limited to, §48(a) of the ICA (15 U.S.C. 80(a)-47(a)) and

§13(a) of the ICA, 15 U.S.C. § 80a-13(a).

39. Plaintiff has suffered injury in fact and has lost money or property as a result of defendants' unfair competition, as alleged herein. Specifically, Plaintiff has suffered economic injury as a result of the alleged unfair competition and seeks an order to restore to any person in interest any money that may have been acquired by means of such unlawful conduct, as provided in California Business & Professions Code §17203.

40. All of the wrongful conduct alleged herein occurred and continues to occur in the conduct of the defendants' business. The wrongful conduct is part of a pattern or generalized course of conduct that has been repeated in the State of California on hundreds of occasions. The conduct thus impacts the public interest.

41. As a direct and proximate result of the wrongful conduct, Plaintiff and the members of the Class have sustained substantial damages in connection with losses in the Fund's value that, beginning in late 2007, resulted from the Fund's deviation from its stated fundamental investment policy.

42. Plaintiff therefore requests that this Court enter such orders or judgments as may be necessary to restore to any person in interest any money that may have been acquired by means of such unlawful conduct, as provided in California Business & Professions Code §17203 and Civil Code §3345, and for such other relief as set forth in the Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his own behalf, and on behalf of all others similarly situated, prays for the following relief:

(1) An order certifying this action as a class action and appointing Plaintiff and his counsel to represent the Class;

(2) An order awarding Plaintiff and Class members a statutory recovery (including restitution) in an amount to be determined at trial;

(3) Disgorging from defendants for the benefit of the Class any management or other fees to be forfeited as a result of defendants' deviation from the Fund's fundamental investment objectives;

(4) An order awarding Plaintiff and Class members prejudgment interest, fees and costs incurred in this action, including counsel fees and expert fees;

(5) Entry of such orders or judgments as may be necessary to restore to any person in interest any money that may have been acquired by means of unlawful business acts and practices; and

(6) Such equitable, injunctive or other relief this Court deems just and proper.

DATED: November 19, 2010

FINKELSTEIN THOMPSON LLP

*Rosemary Rivas*
Rosemary M. Rivas

Mark Punzalan
100 Bush Street, Suite 1450
San Francisco, California 94104
Telephone: (415) 398-8700
Facsimile: (415) 398-8704

Robert J. Dyer III
Jeffrey A. Berens
**DYER & BERENS LLP**
303 East 17th Avenue, Suite 300
Denver, CO 80203
(303) 861-1764
(303) 395-0393 (fax)

*Counsel for Plaintiff and the Proposed Class*